# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HEIDI HUMPHRIES d/b/a MOTHER'S MILK BREASTFEEDING SUPPLIES, : : : | |
| Plaintiff, : | C.A. No. |
| : | |
| v. : | JURY TRIAL DEMANDED |
| : | |
| TOYS "R" US, INC., d/b/a Babies "R" Us, : BABIES "R" US, INC., TOYS "R" US - : DELAWARE, INC.; and MEDELA, INC., : : | |
| Defendants. : | |

## COMPLAINT

Plaintiff Heidi Humphries d/b/a Mother's Milk Breastfeeding Supplies ("Humphries," "Mother's Milk" or "Plaintiff"), for her Complaint, alleges as follows based upon personal knowledge, the investigation of counsel, information and belief, and publicly-available information:

## INTRODUCTION

1.      Plaintiff, a highly-efficient internet-based retailer of breast pumps and accessories, files this complaint against defendants Toys "R" Us, Inc., doing business as Babies "R" Us, Babies "R" Us, Inc., and Toys "R" Us - Delaware, Inc. (collectively, "BRU") and Medela, Inc. ("Medela") (BRU and Medela are collectively referred to as "Defendants").

2.      Plaintiff seeks to obtain damages and equitable relief from BRU under, *inter alia*, Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2.  Plaintiff seeks to obtain damages and equitable relief from Medela under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  As detailed below, Plaintiff alleges that BRU, a dominant, multi-brand retailer, coerced and induced Medela to agree to enter into, maintain, and enforce minimum resale price

maintenance agreements with retailers of breast pumps, including Plaintiff and others (the "Retailers"). The agreement or agreements between Medela and BRU prevented Plaintiff, on penalty of termination (*i.e.*, being refused supply), from charging and/or advertising prices that were lower than the agreed minimum prices (the "BRU-Medela Agreement").[1]

3.      Medela is a manufacturer of high-end breast pumps. The relevant high-end pumps manufactured by Medela are carried by specialty baby retailers such as Plaintiff and BRU, but not typically by general discounting retailers like Wal-Mart, K-Mart, or warehouse clubs like Sam's Club.

4.      Both the BRU-Medela Agreement and the resulting Medela-Retailer Agreement are comprised of contracts, combinations and/or conspiracies, whether oral or written, express or tacit.

5.      The Agreements, and each of them, unreasonably restrain trade in the relevant market (defined below), causing substantial anticompetitive effects and net losses in consumer welfare, in violation of § 1 of the Sherman Act.

6.      Moreover, the Agreements were part and parcel of an anticompetitive scheme under which BRU leveraged its substantial market power and dominance to induce Medela into agreeing to (a) impose and/or amend minimum resale price maintenance agreements on Retailers, including on internet discounters like Plaintiff, (b) enforce and/or heighten enforcement of those agreements against Plaintiff and other Retailers, but not against BRU, (c) otherwise prevent Retailers from discounting Medela breast pumps and/or protect BRU from

---

[1] The agreements between BRU and Medela that Medela would impose, amend, enforce, and/or heighten enforcement of minimum resale price maintenance agreements upon retailers including Plaintiff shall hereinafter be referred to as the "BRU-Medela Agreement." The agreements between Medela and retailers to maintain minimum resale prices and/or otherwise not to discount shall hereinafter be referred to as the "Medela-Retailer Agreements." Where appropriate, both types of agreements relevant here shall be referred to collectively as "the Agreements."

having to suffer the profit-lowering effects of retail price competition, and (d) cut off supply to price-cutting retailers like Plaintiff. Through this scheme, BRU agreed and conspired with Medela to fix prices at artificially high levels, unreasonably restrain trade, and to illegally maintain and enhance BRU's monopoly power.

7.      The Agreements, and the scheme in restraint of trade by BRU and Medela, have harmed competition, including inter-brand competition, in the relevant market and caused prices to be higher in the relevant market than they otherwise would have been. The Agreements were specifically intended to protect BRU from price competition from highly efficient retailers like Plaintiff by either mandating higher price levels, and thereby neutering the competition, or by eliminating the price-cutting competition entirely. The Agreements were also part of BRU's monopolistic scheme, which was designed to preserve and enhance BRU's market dominance and monopoly power. This scheme achieved its goals, and thereby excluded and frustrated competitors, such as Plaintiff, substantially inflated prices to consumers, and reduced consumer welfare.

8.      Because Plaintiff was a highly efficient internet retailer, Plaintiff won sales and grew her businesses by dropping her prices lower than those of competitors (such as BRU). Conversely, Plaintiff lost sales when she was prevented from dropping her prices lower than competitors such as BRU, and when she was cut off from supply entirely. Thus, the Agreements and Defendants' scheme have injured Plaintiff by (a) depriving her of sales and profits that Plaintiff would otherwise have garnered, and (b) diminishing of the capital value of Plaintiff's respective business. The Agreements and Defendants' conduct impaired Plaintiff's ability to compete with BRU and to take sales from BRU by preventing Plaintiff from exploiting her highly efficient business model and/or by cutting her off entirely for the offenses of cutting

prices below agreed levels and otherwise forcing BRU to engage in price competition that reduces prices and benefits consumers but lowers BRU's profits.  In fact, prior to the imposition of the Agreements, Plaintiff was rapidly growing her respective sales of the Medela breast pumps through, among other things, aggressive price competition.  However, the Agreements and other alleged conduct of Defendants were intended to, and did, reverse those trends, and substantially harmed Plaintiff thereby.

9.    BRU's conduct has also tortiously interfered with the contractual relationships between Plaintiff and Medela and unjustly enriched BRU at the expense of Plaintiff.

## JURISDICTION AND VENUE

10.    Original jurisdiction over Plaintiff's claims vests in this Court under 28 U.S.C. § 1331, inasmuch as this action arises under the laws of the United States.  For those claims arising under state law, all of which are so related to the claims arising under the laws of the United States as to constitute the same case or controversy, Plaintiff invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a).

11.    Venue is proper in this federal judicial district under 15 U.S.C. § 15(a) because Defendants reside, or are found, or have an agent here.  Alternatively, venue is proper in this judicial district under 15 U.S.C. § 22 because Defendants are found or transact business here.  Alternatively, venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because Defendants reside in this judicial district within the meaning of 28 U.S.C. § 1391(c).  Alternatively, venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this lawsuit occurred here.

## PARTIES

12.    Plaintiff Heidi Humphries was a retailer of Medela breast pumps and accessories through the eBay website from 1999 to 2007.    Humphries is a resident of the State of Florida.

13.    Defendant Toys "R" Us, Inc., which does business as Babies "R" Us,  is a corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business located at One Geoffrey Way, Wayne, NJ 07470.

14.    Defendant Babies "R" Us, Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business located at One Geoffrey Way, Wayne, NJ 07470.

15.    Defendant Toys "R" Us - Delaware, Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business located at One Geoffrey Way, Wayne, NJ 07470.

16.    Toys "R" Us, Inc., doing business as Babies "R" Us, Babies "R" Us, Inc., and Toys "R" Us - Delaware, Inc. shall hereinafter be referred to collectively as "BRU."

17.    Defendant Medela, Inc. is a corporation duly organized and existing under the laws of the state of Delaware, with a principal place of business at 1101 Corporate Drive, McHenry, IL 60050.

## FACTS

18.    In 1999, after giving birth to her first child, Humphries started a retail business, Mother's Milk Breastfeeding Supply, out of her home selling breast pumps and accessories.  She used eBay[2] as her selling platform, selling these products over the internet.

---

[2] eBay is a popular internet Website (www.ebay.com), operated by eBay, Inc., that allows private sellers to list goods they wish to sell, either through an auction or at a fixed price.

19.     Prior to starting her business, Humphries worked as a registered nurse at Broward General Medical Center in Fort Lauderdale, Florida on a neonatal floor.  In that capacity, she gained expertise in breast pumps and breast feeding.  She also established relationships with sales representatives of various companies that make and sell breast pumps, including Medela.

20.     Medela and other companies that make breast pumps routinely enter into contracts with hospitals as part of a strategic effort to market breast pumps to new mothers.

21.     Taking advantage of her expertise in breast pumps and breast feeding, Humphries doing business as Mother's Milk Breastfeeding Supply became an authorized Medela dealer in 1999.  As such, Mother's Milk would place orders to Medela for breast pumps and accessories and Medela would ship the products to Humphries's house.

22.     Medela at all relevant times knew that Mother's Milk sold Medela breast pumps on the internet using the eBay selling platform exclusively.

23.     Mother's Milk's business model was to become the most knowledgeable breast pump seller on eBay (there were other breast pump sellers that used eBay as their selling platform).  In addition to selling breast pumps on eBay, Mother's Milk, through Humphries, also answered questions that breast pump purchasers had about breast feeding and breast pump products.  Humphries would answer such questions via email and telephone conversations.

24.     Mother's Milk was very effective in assisting breast pump purchasers and soon became known as "The Breast Pump Expert" on eBay.

25.     Through 1999 Mother's Milk's business grew steadily.  Humphries packed and shipped her breast pumps from her home.  Selling mostly Medela and Ameda products, Mother's Milk sold nearly $190,000 of breast pumps and related products in 2000.

6

26.     By 2001 she had grown her business to over a half million dollars in sales, packing and shipping out of her home.

27.     Mother's Milk's business grew sufficiently that by 2004 Humphries hired an employee to answer the phone and rented warehouse space.  Humphries herself provided over 99% of the customer service to help customers buy the right breast pump for their use.

28.     Mother's Milk interacted with Medela through a Medela employee, a sales representative named Carol Schuler.

29.     For the 3 years 2002 through 2004, Medela told Mother's Milk that she had the third most Medela sales of any Medela dealer.

30.     Some Mother's Milk customers told Humphries that, but for Mother's Milk's discounted pricing, the buyers could not afford to purchase Medela products.

31.     When customers would ask Humphries why Mother's Milk sold Medela breast pumps at lower prices, Plaintiff explained that she had very low overhead and expenses.

32.     In July of 2002 Medela terminated at least seventeen internet based retailers, at BRU's behest, pursuant to the Agreements.  In a letter, Medela Chief Financial Officer Vern Reizman explained that surviving retailers had to "be very careful not to explain [to customers] why Medela has taken such action."

33.     From 1999 and through 2005, Medela would periodically and several times per year contact Mother's Milk to raise the retail price of the Medela breast pumps.  Each time that Medela instructed Mother's Milk to raise its price of Medela breast pumps, Mother's Milk would do so.  After initially raising the price of Medela breast pumps at Medela's instruction, Mother's Milk would gradually reduce the price of Medela breast pumps to increase in sales.  This pattern repeated itself several times per year from 1999 to 2005.

34.     Mother's Milk generally placed orders with Medela through a Medela customer service employee named Ken.  Ken advised Humphries to price Medela breast pumps close to BRU and to reduce total sales so that Mother's Milk would not be cut off by Medela and she agreed to do so to avoid termination.

35.     After 2003, Medela often failed to fulfill Mother's Milk's orders in full to punish Mother's Milk for discounting.

36.     On or around May 16, 2005 a Medela employee named Rick communicated to Mother's Milk that Mother's Milk was selling Medela breast pumps at too low of a price. Mother's Milk agreed to raise its prices on Medela breast pumps to avoid termination.

37.     In 2005 Medela, through a telephone call from Debra Kurtz, the Medela Director of Sales and Marketing told Humphries that Mother's Milk was being cut off and that Medela would no longer supply Mother's Milk purchase orders.  In fact, Medela terminated Mother's Milk at BRU's behest pursuant to the Agreements, to protect BRU's profits.

38.     After being terminated by Medela, Mother's business suffered dramatically.  Its sales plummeted from a high of over $1.5 million to under $500,000 in 2005.  By 2008 Mother's Milk was out of business.  The consequences were materially caused by Medela's termination of Mother's Milk pursuant to the Agreements.

39.     BRU is a dominant, multi-brand retailer of baby and juvenile products, which opened its first stores in 1996.  As of January of 2005, BRU operated over 200 Babies "R" Us stores throughout the United States.  In a recent form 10-Q filing with the United States Securities and Exchange Commission, BRU stated that it considers itself the "largest specialty retailer of baby-juvenile products in the United States" and the "only specialty retailer in its category that operates on a national U.S. scale."

8

40. BRU sells juvenile furniture, such as cribs, dressers, changing tables; bedding and related accessories; baby gear, such as play yards, booster seats, high chairs, strollers and car seats; toddler and infant plush toys; gifts; clothing; infant feeding supplies; health and beauty aids; and infant care products. In addition to its stores, BRU retails over the internet at www.babiesrus.com.

41. Relative to BRU, Plaintiff is a small retailer that competes in what was, in 1999 when she started, a relatively new, innovative trade channel known variously as "electronic commerce," "e-commerce," "e-tailing," "internet retail," *etc*. Specifically, Plaintiff is an internet retailer of high-end breast pumps.[3] Plaintiff is a highly efficient competitor because, among other reasons, Plaintiff's operating expenses are low. This allows Plaintiff to compete vigorously on price, both with other internet retailers and with retailers in other trade channels, such as BRU (which operates through "brick and mortar" stores as well as on the internet). Like many other efficient internet retailers, Plaintiff wins sales by dropping prices lower than those of competitors such as BRU; conversely, Plaintiff loses sales if Plaintiff is prevented from dropping prices lower than those of competitors (or if Plaintiff is prevented from getting supply of Medela breast pumps).

42. When allowed to compete freely, the price competition in which Plaintiff and other internet retailers engage enhances consumer welfare by bringing down prices. For instance, if Plaintiff's competitors, such as BRU, did not lower their prices to match or beat Plaintiff's prices, those competitors would lose sales to Plaintiff. This is a classic example of the pro-competitive benefits of price competition.

---

[3] The term "high-end" is meant to include the highest quality, higher price-point breast pump models sold by Medela and other baby product manufacturers.

43.    BRU has known, since the late 1990s, that the increasing popularity of "e-commerce," with its associated increase in price competition, would pose a substantial threat to BRU's sales and profits.  For example, recently BRU has made public statements admitting its fear of price competition from efficient competitors like Plaintiff.  In January of 2005, BRU wrote in a form 10-K filing that "[s]ome of our competitors may have greater financial resources, lower merchandise acquisition costs, and lower operating expenses than our Company.  If we fail to compete successfully, we could face lower net sales and may decide to offer **greater discounts to our guests**, which could result in **decreased profitability**" (emphasis added).

44.    BRU thus stated its fears that competitors like Plaintiff would force it to give greater discounts to its customers and thereby lower BRU's profits.  BRU reacted aggressively to this important threat to its pricing freedom and profitability.  BRU sought to avoid such competitive constraints on its ability to garner increased sales volume and inflated prices.

45.    The tremendous pressure upon a dominant retailer (like BRU) in a traditional trade channel (like the "brick and mortar" trade channel) to react anti-competitively to threats to its pricing freedom, such as those posed by retailers in a new, innovative and efficient trade channel (like Plaintiff), have been the subject of study by, and recent testimony before, the Federal Trade Commission ("FTC").  As one participant in the FTC's 2002 public workshop, entitled "Possible Anticompetitive Efforts to Restrict Competition on the Internet," stated:

> The promise of the world of electronic commerce is to create an environment where consumers can freely shop between various competitive alternatives.  By reducing transaction costs and improving transparency, the Internet offers the potential of dramatically improving competition in various retail markets.
>
> * * * [But] **as new market forces arise, . . . "traditional" competitors often respond to the threat by trying to create barriers to thwart those new entrants**.

10

*See* David A. Balto, Testimony Before the FTC, Office of Policy Planning, Public Workshop on E-Commerce, at 1-2 (October 10, 2002) (emphasis added).

46.    Medela sells substantial shares of its total volume of the breast pumps at issue through BRU, and thus has become increasingly dependent upon BRU for its business.

47.    Because suppliers of products (like Medela) depend on retailers (like BRU) to sell their products, it is not surprising that a dominant retailer like BRU would use that dominance to protect against price competition by coercing suppliers like Medela into disadvantaging retailers (like Plaintiff) in the new, efficient trade channel.

48.    For instance, speaking at that same FTC public workshop, FTC Commissioner Sheila Anthony underscored the potential threat to competition posed by a dominant retailer (like BRU), whom suppliers (like baby product manufacturers) cannot do without.  The concern is that a dominant retailer like BRU could use its market power to coerce key suppliers into disadvantaging competing retailers (like Plaintiff), and thereby protect and preserve its market dominance:

> Competition among distributors for a given manufacturer's favor is almost certainly healthy.  But problems may arise where distributors in one channel exercise their market power to disadvantage distributors in another channel. * * * [C]an Internet distribution ever gain a strong foothold in some product areas where the entrenched distribution channel, members who manufacturers cannot do without, at least until e-commerce matures, use hardball tactics to make sure that the transition period never begins?

*See* FTC, Public Workshop:  Possible Anticompetitive Effects to Restrict Competition on the Internet, transcript of proceedings, at 797:12-16, 799:7-12 (October 10, 2002) (remarks of Commissioner Sheila F. Anthony).

11

49.    Indeed, because of BRU's position as a dominant retailer in the relevant market, BRU was able to, and did, induce and require the creation of the BRU-Medela Agreement. Among the relevant provisions of the BRU-Medela Agreement was that, in consideration (and as a condition) of BRU's starting (or continuing) to stock and sell Medela breast pumps, Medela had to ensure that Retailers, such as Plaintiff and others, would, on penalty of termination, charge a minimum resale price for Medela breast pumps, to insulate BRU from the profit-lowering effects of having to engage in retail price competition that increases consumer welfare and is otherwise procompetitive.

50.    There is overwhelming evidence of the BRU-Medela Agreement, including but not limited to the following:

a.    In conversations with her Medela sales representative, Humphries was told that minimum pricing was enforced because of pressure on Medela from BRU.

b.    A Medela sales representative told Humphries, "don't go too far below BRU" and "stay close to BRU" in order to remain a Medela retailer.

c.    BRU required Medela to impose and/or amend  minimum resale pricing with respect to Medela's other Retailers (*i.e.*, BRU's retailer competitors), in a form that met with BRU's prior approval, and Medela acquiesced in such demands;

d.    BRU was not similarly required to comply with minimum resale pricing, but instead charged retail prices that were effectively just slightly lower than the prices at which BRU required Medela to ensure other Retailers were selling (but which were far higher than the retail prices at which BRU could profitably sell but for the conduct challenged in this lawsuit);

e.    BRU dictated terms and conditions under which Medela had to do business with their other Retailers (*i.e.*, BRU's retailer competitors), and Medela agreed to same, including but not limited to:

(1)    dictating the resale prices such other Retailer customers of Medela had to charge for Medela breast pumps; and

(2)    dictating who the Retailer customers of Medela would, and would not, be;

f.    BRU demanded, or threatened to demand, compensation from Medela for profits BRU lost when BRU had to engage in profit-lowering retail price competition due to Medela's breach of its obligations under the Agreement to prevent other Retailers from discounting or effectively discounting the Medela breast pumps, and Medela paid, considered paying, and/or attempted to develop methods to avoid having to pay, same;

g.    BRU engaged in extensive retail price surveillance to ensure that Medela was not in breach of the BRU-Medela Agreement, and Medela, fearful of being found in breach, did so as well;

h.    BRU and Medela together co-developed strategies to insulate BRU from having to engage in profit-lowering retail price competition and to obviate the need for BRU to demand compensation from Medela when such competition occurred;

i.    but for the conduct challenged in this case, the BRU-Medela Agreement was not in Medela's economic interests, because it had the effect of slowing sales, among other adverse effects;

j.    BRU was a dominant retailer on whom Medela depended for substantial percentages of its sales, and had the ability to penalize Medela severely, including through the cancellation of large orders;

k.    It was BRU's motive, intent, plan, pattern, and *modus operandi* to enter into agreements like the BRU-Medela Agreement.  Examples are revealed in the court's July 15, 2009 decision granting class certification in *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461, 476 (E.D. Pa. 2009), where the court found, by a preponderance of the evidence and for purposes of class certification, that the "evidence indicates that BRU pressured the manufacturers to prevent internet discounting."  *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461, 488 (E.D. Pa. 2009).

l.    The court's July 15, 2009 decision granting class certification found that "internal documents indicate that BRU coerced the restraints" central to the BRU-BPM Agreements.  *Id*. at 489.  As noted by the court

> Medela stated: "We discontinued internet sellers to protect BRU's business and margin and therefore accepted considerable legal risk." (Pl.'s Ex. 80.) BRU negotiated to expand Maclaren-stroller sales in exchange for Maclaren implementing "a better retail price." (Pl.'s Ex. 64.) BRU agreed to meet with Regal Lager and BabyBjorn about selling carriers only when they agreed to change their distribution policy (Pl.'s Ex. 156), and BRU waited to order carriers until the day after their new policy became effective (Pl.'s Exs. 61-62). Finally, Britax stated that its distribution policy was designed to "eliminate the potential of margin equalization requests from Britax's largest customer base," which evidence shows was BRU. (Pl.'s Ex. 126.) Britax explained that the policy "allows BRU to directly benefit from consumers no longer finding discounted Britax products on the Internet." n18 (Pl.'s Ex. 120.).

*Id*.  Evidence of two others are:

(1)    Marsha Costello of BRU told Clyde Leach of Leachco that a

condition of BRU's buying Leachco products for resale through

14

BRU was Leachco's ensuring that all of Leachco's other Retailer customers refrained from discounting Leachco's products; and

(2)    Marty Fogelman of BRU threatened Michael Grant and Robert Holcomb of Combi that BRU would stop buying Combi products for resale unless Combi ensured that internet retailers did not discount Combi products; and

51.    BRU required Medela to enforce and/or heighten the enforcement of minimum resale pricing, as is described more fully below, and Medela acquiesced in such demands.

52.    BRU required Medela to agree to enforce minimum resale pricing on Medela's flagship product before BRU would begin buying that product from Medela, and Medela agreed.

53.    The information in paragraphs 54 through 98 is based on the publicly available Third Amended Complaint in *Babyage.com Inc., et al. v. Toys "R" Us, Inc., et al.*, No. 05-6792, (E.D. Pa.).

54.    In or about October 1999, BRU agreed to purchase the breast pump product known as the "Pump In Style" ("PNS") from Medela for sale at BRU's stores.

55.    Just after entering this agreement but before BRU began buying the PNS from Medela, Medela received what Medela viewed as a "surprise visit" from two BRU representatives, including BRU's President.

56.    At this meeting, BRU's President required Medela to do two things as a condition of BRU's buying the PNS from Medela: (i) agree that both parties would uphold Medela's minimum resale pricing policy and that the PNS would be priced by all Retailers between $249.50 and $277.00; and (ii) provide BRU with a list of internet Retailers selling Medela

products, so that BRU could watch to ensure that Medela enforced the pricing policy on BRU's competitors. Medela agreed to BRU's demands.

57.    With these commitments from Medela in hand, BRU began selling the PNS at its stores.

58.    Due to Medela's fear of losing BRU as a customer, Medela agreed to allow BRU to control retail pricing of Medela's products.

59.    From that moment forward, BRU effectively set the terms under which Medela would do business with its other Retailer customers. For instance, Medela rarely made a decision regarding retail price without first seeking BRU's agreement and approval.

60.    For example, in 2001, Medela specifically sought BRU's permission to lower certain suggested retail prices. Medela desired to lower prices because sales of its product were "under performing" in "mass retail (i.e., Target [stores]) where we do not outsell competition and retailers are requesting lower retails."

61.    Initially, in May 2001, BRU took the position that Medela could change prices "as long as the pricing of the product remains consistent across the market, which with your product isn't an issue."

62.    At no time during Medela's discussion with BRU did BRU suggest increasing prices in order to stimulate service, information production, advertising, access to better shelf space, or any other service or product of any use to Medela, or increasing Medela's ability to serve its customers.

63.    BRU's only concern was consistent – or fixed – prices across the market.

64.    However, as Medela's discussions with BRU in 2001 progressed, BRU's president began to veto Medela's requests that it be permitted to lower retail prices on its breast

16

pumps, other than the PNS, again dictating the terms under which Medela would do business with its other Retailer customers. BRU refused to allow Medela to lower its prices based on BRU's desire to protect its own margins and revenues.

65.    BRU also demanded that Medela take action against BRU's retail competitors that were discounting Medela's products. As a result, at BRU's behest, Medela sent retailers, on information and belief, "Dear Customer" letters that stated that the Retailers were required to maintain MSRPs.

66.    With BRU dictating the terms under which Medela would conduct business with its other retail customers, Medela could not act in contravention of BRU's decisions without the risk that it would lose BRU's business.

67.    Thus, in March 2002, Medela discontinued minimum resale pricing which had allowed Retailers to sell the PNS at discounted prices so long as the discount was less than 10% below the suggested retail price.

68.    BRU terminated Medela for Medela's perceived breach of the Agreement.

69.    In its continuing efforts to control the terms and conditions under which Medela did business with its various Retailer customers, following the discontinuation of Medela's written Minimum resale pricing, BRU sought Medela's agreement to enforce unwritten minimum resale pricing provisions and to terminate internet Retailer accounts that discounted, in order to protect BRU's margins.

70.    By February 2002, Medela was characterizing the fact that "BRU is our largest customer, 13% of sales" as "Bad News." Medela recognized that it had become very dependent on BRU as a customer, and thus "[i]f BRU doesn't order, we have a bad month."

71.    Because Medela was reliant on BRU for a large portion of its sales, Medela proposed a sales project in order to grow other existing Retailer accounts and to add new Retailer accounts "to offset BRU."  But Medela couldn't offset BRU's power or Medela's reliance on BRU fast enough.

72.    During 2002, BRU was tracking the internet Retailers to which Medela was selling its products, and growing increasingly upset with Medela's continued sale of its products to internet discounters who had lowered retail prices for the PNS.

73.    Fearing a loss of BRU's business, Medela agreed with BRU to attempt to force its retail customers once again to maintain Medela's MSRPs.

74.    BRU then decided to punish Medela for its failure to abide by BRU's orders to ensure that other Retailers were not underselling BRU on the PNS, and to coerce Medela into once again allowing BRU to set the terms and conditions under which Medela did business. Medela's National Sales Manager sent the following message: "As of last night, please cancel all orders."

75.    The message was received loud and clear.  Medela immediately held meetings and discussions with BRU.  During these discussions, BRU's President told Medela executives he had felt "cornered, [and that] using power of pencil with order was only way to make a statement."  BRU further told Medela it had to agree to stop allowing discounters to sell Medela's products.   Medela agreed.

76.    In direct response to BRU's intimidation and conditions, Medela again agreed to enforce the minimum resale pricing.

77. Within two days of termination, Medela responded by agreeing to BRU's demand, making clear that it would cooperate and "correct the market" in order to conform to BRU's conditions.

78. BRU thus moved swiftly to reassert its control over the manner in which Medela did business. On June 21, 2002, after tracking Medela's customers and finding competing Retailers selling the PNS for significantly less than suggested retail price, BRU sent an e-mail to the stores stating that Medela had a strict policy requiring the retail price of the PNS to be $279.99. BRU then communicated to Medela that Medela should enforce the policy immediately.

79. Although Medela initially objected, BRU demanded that Medela then agree to terminate Retailers that thereafter discounted Medela's products.

80. Medela ultimately agreed to carry out the purge of competing Retailers that BRU demanded, fearing retribution from BRU. At BRU's demand, Medela also agreed that Medela would "develop a list of people to close down."

81. In the past, Medela had rarely, if ever, closed accounts for discounting. However, in the face of BRU's demands and conditions, Medela decided it had no choice but to develop a list of Retailers who would be terminated. Medela's then-Director of Sales and Marketing sent the list to Medela's Former Vice President of Finance, stating:

> Here is the list. Sales is united in shutting down only the following:
> 1. Those with PNS prices below $200 and
> 2. Those with Hi visibility - a score of 3.

Medela's Vice President replied:

> Debra-
> REDACTED

19

> The selling price can not be a factor. You keep coming back to price so I will ask you one more time to not use price as a decision factor. This is very important and I can not go forward with this if you use this word again.
> REDACTED

82.    Thus, in order to avoid identifying price in writing as a factor in the selection process of the Retailers to close, Medela's Sales and Marketing Director re-sent the email later in the day, being sure to avoid the forbidden word "price," and instead citing the "excessive value on PNS."

83.    Ten days later, as BRU and Medela agreed, Medela terminated 17 internet sellers. All were companies that had competed with BRU aggressively on price.  *See* ¶ 34, *supra*.

84.    But, it wasn't an "internal issue" at all: Medela terminated Mother's Milk because it had agreed with BRU that Medela would do so, in order to insulate BRU from price competition, even though such a result, but for the conduct challenged in this case, was not in Medela's economic interests.  In fact, in one document, Medela expressly states:  "we have discontinued internet sellers to protect BRU's business and margin and therefore accepted considerable legal risk."

85.    Medela did not enforce minimum resale pricing for any procompetitive reasons, but did so only to protect BRU's profit margins.

86.    Medela did not take the position that internet sales *per se* have any detrimental effects on its product. Rather, any discussion of internet sales occurred solely with regard to their threat to BRU's business.  Some examples include Medela statements that: "BBB seems to be the most major threat to BRU"; "Babycenter.com is the most major threat to BRU.com"; and "BRU feels Babycenter.com is 'discounting' PNS at $259.99."

87.    Accordingly, Medela did not include babiesrus.com in the list of internet Retailers to pressure or close. In fact, during the time Medela was shutting down 17 internet Retailer accounts at the behest of BRU, BRU's own website made up 25% of all sales at BRU.

88.    Significantly, on August 22, 2002, Medela prepared for a meeting with BRU in response to BRU's May order cancellation. In preparation, Medela internally stressed the need for a new retail pricing agreement for all accounts in order to, per BRU, "address internet pricing issues."

89.    Medela also set its objectives for the meeting, including:

> Prevent from reoccurrence of threats experienced. The goal is long term partnership with bi-lateral planning. We (Medela) want to grow with you (BRU). But because BRU is becoming a large and increasing percentage of Medela's business we need to protect Medela's business and employees.

Further, in the section titled, "What does Medela have to offer?" is the note:

> ***We have discontinued internet sellers to protect BRU's business and margin and therefore accepted considerable legal risk.***

90.    Medela thus admitted that it discontinued internet sellers, who competed aggressively on price, not to advance any pro-competitive business justifications or to attain any pro-competitive results but instead "to protect BRU's business and margin."

91.    Nor can BRU or Medela claim that the minimum resale pricing created higher margins for BRU so that BRU could offer better service than internet Retailers. In fact, Medela did not require BRU to use these higher margins to provide benefits or better service. Rather, Medela provided significantly more extensive programs to BRU, at Medela's own cost, than Medela provided to other Retailers, including, *inter alia*, retail representative in-servicing,

allowances, amounts for advertising, making exclusive products available, and markdown monies.

92.    Moreover, BRU did not in fact offer better service to customers than internet Retailers. Rather, the opposite is true.  Return rates on the PNS to BRU stores were significantly higher than return rates at other outlets.  Medela blamed the high return rates on BRU's poor customer service.

93.    In response to BRU's continued demands, and not for any other reason, Medela adopted a new minimum resale pricing with specific restrictions on internet Retailers.

94.    Throughout this period, Medela recognized that, in order to keep BRU's business, it would be necessary to adopt new minimum resale pricing that protected BRU from competing internet Retailers.

95.    On or about June 23, 2002, a Medela executive authored a memo attempting to justify discontinuing supply of the PNS to all internet Retailers.   Even he recognized, however, that such a move would result in the immediate loss of $3-5 million of business, clearly a move not in Medela's economic interests (but for the conduct challenged in this lawsuit).

96.    Internal reaction by Medela personnel to the memo's suggestion that all PNS supply to internet Retailers be stopped was unfavorable, because it was against Medela's independent economic interests and was being done solely to protect BRU.  The suggested plan was characterized as a move that "kills the whole channel," "punishes all to address the few," and "cut[s] off our nose to spite our face."

97.    Thus, by early July 2002, Medela had reviewed alternative minimum resale pricing documents issued and enforced by other baby product manufacturers selling to BRU, which were likely to meet BRU's preconditions.  Medela obtained the documents, all of which it

found similar, of other baby product manufacturers such as Britax, Peg Perego and Regal Lager, among others.

98.    With these documents in hand and having agreed with BRU to further protect BRU's sales and margins from internet competition, Medela agreed with BRU to modify its distribution policy with respect to internet Retailers.  The new policy attempted to restrict internet Retailers by imposing a requirement that Medela would not sell to Retailers who derived less than 50% of their Medela revenue from direct in-person sales (the "50/50 policy"). However, not only did Medela specifically exempt BRU (which maintains an internet site at www.babiesrus.com) from the policy, but made the change to benefit BRU and pursuant to its BRU-Medela Agreement.

99.    The acquiescence and compliance by Retailers (like Plaintiff) in minimum pricing, was, to Medela, preferable to termination or non-supply of noncompliant Retailers, because Medela wanted, and profited from, sales to the Retailers.  Nevertheless, Medela did not benefit from the higher prices at the retail level, nor did it benefit from the Agreement more generally, except insofar as by entering into the Agreement, Medela avoided harsh retaliation from BRU for breaching the BRU-Medela Agreement.

100.    Thus, Medela did *not* simply or unilaterally:

    a.    refrain from selling to uncongenial Retailers;

    b.    suggest resale prices that were widely followed;

    c.    sanction and/or terminate Retailers who failed to maintain a minimum resale price;

    d.    announce and enforce policies of sanctioning and/or terminating Retailers who failed to maintain a minimum resale price; or

e.    sanction and/or terminate other Retailers following, or in response to, complaints by Retailers such as BRU.

101.    The Agreement represents a conscious commitment to a common scheme, designed to achieve an unlawful objective, between BRU, Medela, and other Retailers.

102.    Plaintiff was terminated (that is, refused supply) by Medela unambiguously because of, pursuant to, and as a part of the Agreement, and for no other (non-pretextual) reason. Specifically, in or around December of 2005, Medela terminated Mother's Milk as a Retailer of its products.

103.    With respect to Medela's termination of Mother's Milk, representatives of Medela told Mother's Milk that the reason for the termination was that BRU was angry about Mother's Milk's low prices.

104.    Medela did not act unilaterally or independently, or in its own economic interest, in entering the BRU-Medela Agreement, when seeking the Retailers' acquiescence to, and compliance with, the terms of the BRU-Medela Agreement, when seeking to have Plaintiff charge minimum resale prices, and/or when terminating Retailers, such as Plaintiff, for violating the Medela-Retailer Agreement.  In fact, absent threatened penalties or sanctions by BRU, it would not be in Medela's economic interests to enter into, maintain, or enforce the Medela-Retailer Agreements.

105.    But for the conduct challenged in this case, it would not be in Medela's interest to enter into the BRU-Medela Agreement.

### MONOPOLY/MARKET POWER

106.    The relevant product market in this case is retail sales of Medela high-end breast pumps.

107.    The relevant geographic market in this case is the United States of America.

108.    By virtue of its power to control prices and exclude competition in the relevant market, BRU at all relevant times possessed monopoly power in the relevant market.  Moreover, at all relevant times BRU possessed dominant shares of the market for retail sales of high-end breast pumps and was a critical outlet for Medela.

109.    Likewise, Medela at all relevant times possessed substantial market power with respect to its high end breast pumps market, due, in part, to the high level of product differentiation in breast pumps.  Specifically, Medela: (a) sold its breast pumps at prices in excess of marginal costs, (b) enjoyed high profit margins thereon, (c) sold breast pumps substantially in excess of the competitive price, (d) enjoyed substantial barriers to market entry and growth, and (e) would not, by raising prices for its breast pumps a small but significant nontransitory amount, lose sufficient sales to make such a price increase unprofitable.  Despite this market power, Medela was and is nevertheless substantially reliant upon BRU for its sales, sales growth, and profitability.

## ANTITRUST INJURY AND OTHER COGNIZABLE HARM

110.    Defendants' anticompetitive conduct as hereinbefore described was a material cause of substantial harm to competition, including inter-brand competition, in the relevant market.  The Agreement has made prices for high end breast pumps supracompetitive.  But for the Agreement, competition would increase, and prices for high end breast pumps would fall substantially.

111.    BRU's violations of §§ 1 and 2 of the Sherman Antitrust Act, and of state law, and Medela's violations of § 1 of the Sherman Antitrust Act, as herein described, are a material cause of injury to Plaintiff's business and property, in the nature of lost profits and the

diminished capital value of Plaintiff's business.  Specifically, the Agreement has materially caused Plaintiff to enjoy fewer sales and lower profits.  But for the Agreement, Plaintiff would have enjoyed far greater sales.  Indeed, prior to the creation of the Agreement, Plaintiff's sales of Medela breast pumps were growing at high rates due to low prices, efficient sales practices, and excellent customer service.  But, after the imposition of the Agreement, where supply was not terminated entirely, sales growth has either slowed or gone substantially negative for Medela breast pumps, which make up a significant part of Plaintiff's business.

112.    The Agreement occurred in and/or affected interstate commerce.

**CLAIMS FOR RELIEF**

**CLAIM I:  VIOLATION OF 15 U.S.C. § 1 (AGREEMENTS RESTRAINING TRADE)**

113.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

114.    This claim is pled as to BRU and Medela.

115.    The Agreements and their enforcement, constitute contracts, combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market, and harmed Plaintiff thereby.

116.    The Agreements cover a sufficiently substantial percentage of the relevant market to harm competition.

117.    BRU and the Medela are liable for the creation, maintenance, and enforcement of the Agreements under a "quick look" and/or rule of reason standard.

118.    BRU and Medela each possess market power.

119.    The Agreements harmed competition, including inter-brand competition, by making prices higher than they would have been but for the Agreements.

26

120.    There is no legitimate, procompetitive business justification for the Agreements that outweighs their harmful effect.  Even if there were some conceivable such justification, the Agreements are broader than necessary to achieve such a purpose.

## CLAIM II:  VIOLATION OF 15 U.S.C. § 2 (MONOPOLIZATION AND MONOPOLISTIC SCHEME)

121.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

122.    This claim is pled as to BRU only.

123.    At all relevant times, BRU possessed monopoly power in the relevant market and exercised dominant retail power.  BRU possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

124.    At all relevant times, Medela possessed substantial market power in the relevant market.

125.    By the Agreements, BRU willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiff thereby.  It was BRU's conscious object to further its dominance in the relevant market by and through the Agreements.

126.    BRU's conduct, including them BRU-Medela Agreement, the Medela-Retailer Agreements (which were a product of the BRU-Medela Agreement), their enforcement, and BRU's coercion of Medela, constitutes an anticompetitive scheme to acquire and maintain monopoly power in the relevant market.

127.    BRU's willful maintenance of monopoly power has made it difficult or impossible for competitors, such as Plaintiff herein, to engage in fair competition.

**CLAIM III: VIOLATION OF 15 U.S.C. §§ 1 AND 2 (CONSPIRACY TO MONOPOLIZE)**

128.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

129.    This claim is pled as to BRU and Medela.

130.    Through the Agreements, BRU and Medela conspired to maintain and enhance BRU's monopoly power in the relevant market.

131.    BRU and Medela knowingly and intentionally entered into the Agreements.

132.    BRU and Medela specifically intended that the Agreements would maintain BRU's monopoly power in the relevant market, and injured Plaintiff thereby.

133.    BRU and Medela committed at least one overt act in furtherance of the conspiracy.

**CLAIM IV:  VIOLATION OF 15 U.S.C. § 2 (ATTEMPTED MONOPOLIZATION)**

134.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

135.    This claim is pled as to BRU only.

136.    The Agreements were unreasonably exclusionary.

137.    By the BRU-Medela Agreement, BRU induced Medela to enter into the Medela-Retailer Agreements, with the specific intent to achieve monopoly power in the relevant market. It was BRU's conscious object to control prices and/or to exclude competition in the relevant market.

138.    The natural and probable consequence of the Agreements, which was plainly foreseeable to BRU, was to give BRU control over prices and/or to exclude or destroy competition in all or some of the relevant market, to the extent it has not already succeeded.

139.    There is a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that BRU will succeed in and achieve its goal of obtaining monopoly power in the relevant market.

## CLAIM V:  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

140.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

141.    This claim is pled as to BRU only.

142.    Plaintiff had an existing and prospective contractual relationship with Medela pursuant to which Plaintiff would charge prices to its customers that were less than the prices BRU charged.

143.    BRU purposefully induced Medela to enter into a BRU-BPM Agreement, with the specific intent to harm the existing relationship between Plaintiff and Medela, and/or to prevent the prospective future relationship, between Plaintiff and Medela.

144.    BRU's conduct was neither privileged nor justified, but instead was improper.

145.    BRU has engaged in conduct which is deliberately oppressive indicating a wanton disregard of the rights of Plaintiff and, accordingly, an award of punitive damages is necessary and appropriate.

## CLAIM VI:  UNJUST ENRICHMENT

146.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

147.    This claim is pled as to BRU only.

148.    BRU was unjustly enriched at Plaintiff's expense to the extent of sales and sales revenues it garnered as a material result of the illegal conduct complained of herein.

149.    BRU's acceptance and retention of the benefit make it inequitable for BRU to retain it without paying the value thereof.

## ENTITLEMENT TO INJUNCTIVE RELIEF

150.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

151.    BRU and the Medela's conduct is ongoing, likely to recur, and, unless enjoined, will continue into the future, causing irreparable further injury to Plaintiff's business and property.

152.    Plaintiff prays that the Court enjoin the Agreements, and their enforcement, pursuant to 15 U.S.C. § 26.

153.    With respect to its claims arising under state law, Plaintiff further avers that, in light of BRU's ongoing conduct, an action at law affords Plaintiff an inadequate remedy.

## RELIEF REQUESTED

154.    Plaintiff demands the following relief:

A.    Judgment in her favor and against BRU and Medela, jointly and severally;

B.    Compensatory damages in an amount in excess of the limits for mandatory arbitration, trebled on the federal antitrust claims;

C.    Punitive and exemplary damages on appropriate claims;

D.    An order or decree permanently enjoining the Agreement and its enforcement;

E.    Restitution and/or disgorgement of BRU's unjust enrichment;

F.    Costs, including reasonable attorneys' fees;

G.    Pre- and post-judgment interest;

H.    Such other and/or further relief as the Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

December 18, 2009


 /s/ Kendall S. Zylstra                              /s/ Peter Kohn

Kendall S. Zylstra                           Peter Kohn
**FARUQI & FARUQI, LLP**                      **BERGER & MONTAGUE, P.C.**
2600 Philmont Avenue, Suite 324              1622 Locust Street
Huntingdon Valley, PA 19006                  Philadelphia, PA 19103
Tel: (215) 914-2460                          Tel: (215) 875-3000
Fax: (215) 914-2462                          Fax: (215) 875-4604

Richard D. Schwartz
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, NY 10017
Tel: (212) 983-9330
Fax: (212) 983-9331